# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

MICHEALA MICHELLE LUDWICK,
an Individual,

Plaintiff,

v.

Case No.: 25-cv-00320
Judge Jane M. Beckering
Mag. Judge Sally J. Berens

CLINTON COUNTY, MICHIGAN, a state of Michigan municipality, SHERIFF SEAN DUSH, individually and as employee/agent Clinton County, CLINTON COUNTY SHERIFF'S OFFICE, DEPUTY ALEXIS CHAPKO, individually and as employee/agent Clinton County, SERGEANT RICHARD STOUT, individually and as employee/agent Clinton County, ~~DAWN THELEN, L.P.N., individually and as employee/agent Clinton County~~, JOHN DOES, to be named individually and as employees/agents Clinton County,
ADVANCED CORRECTIONAL HEALTHCARE, INC., an Illinois corporation

Defendants.

| | |
|---|---|
| JACOB A. PERRONE (P71915)<br>Dragon Lawyers PC<br>Attorney for Plaintiff<br>325 East Grand River Ave., Suite 250<br>East Lansing, MI 48823<br>(844) 525-3529<br>Jacob.perrone@yahoo.com | TIMOTHY S. FERRAND (P39583)<br>Cummings, McClorey, Davis & Acho, PLC<br>Attorney for Clinton County, Dush, Sheriff's Office, Chapko, Stout and John Does<br>19176 Hall Road, Suite 205<br>Clinton Township, MI 48038<br>(586) 228-5600<br>tferrand@cmda-law.com<br>tlange@cmda-law.com |

**PLAINTIFF MICHEALA MICHELLE LUDWICK'S RESPONSE TO DEFENDANTS' FIRST INTERROGATORIES AND REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF**

Plaintiff, MICHEALA MICHELLE LUDWICK, by and through her attorneys, DRAGON LAWYERS PC ©, hereby submit the following Responses to Interrogatories and Requests for Production of Documents to Plaintiff.

The information sought must be given under oath, whether secured by you, your agent, representative or attorney or any other person who has made this knowledge known to you or from whom you can get this information and who is competent to testify to the facts stated. The answers must be served upon the undersigned within thirty (30) days of service upon you. These Interrogatories shall be deemed continuing, and supplemental answers shall be required immediately if you, directly or indirectly, obtain further or different information after the time your answers are served upon the undersigned and before the time of trial of this action.

If you cannot answer the following Interrogatories in full after exercising due diligence to secure the information to do so, please so state and answer to the extent possible, specifying your inability to answer the remainder, and stating whatever information or knowledge you have concerning the unanswered portions.\

## GENERAL OBJECTIONS

A. Plaintiff objects to the extent of any individual Interrogatory or Request is overly broad as to time period and/or subject matter, seeks information which is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence, is vague, ambiguous, oppressive, harassing and/or imposes an unreasonable burden on Plaintiff in attempting to ascertain and collect relevant information.

B. Plaintiff objects to the extent that any Interrogatory or Request is argumentative and/or assumes facts concerning Plaintiff that are not established, cannot be proved, and or contested by Plaintiff.

C. Plaintiff objects to the extent that any Interrogatory or Request seeks information which is readily available to Defendant and/or is within Defendant's possession custody and/or control.

D. Plaintiff objects to the extent that any Interrogatory or request is duplicative ( in which case Plaintiff states that each of its responses will be deemed to incorporate information from prior responses).

E. Plaintiff objects to the extent that any Interrogatory or Request seeks information which constitutes attorney-client privileged communication or information.

F. Plaintiff objects to the extent that any Interrogatory or Request seeks to obtain information based on the work product of Counsel for Plaintiff.

G. Plaintiff objects to the extent that any Interrogatory or Request seeks the disclosure of information beyond that required by the Michigan Court Rules or attempts and/or purports to impose greater or different obligations than are imposed by the Michigan Court Rules.

H. These general objections apply to all of the following responses and are incorporated by reference therein.

**Definitions**

The pronoun "you" refers to the party/parties to whom these Requests/Interrogatories are addressed, in his/her/its individual and/or representative capacity.

"Identify" when referring to an actual person, means to provide an identification sufficient to notice the deposition of such person with process to require his or her attendance at the place of examination and shall include, without

limitation, his or her full name, present or last known address, present or last known telephone number, present or last known business affiliation and address, title or occupation, and each position held by such person during the applicable time covered by any answer referring to such person.

"Identify" when referring to a document or writing or any other thing means to give sufficient characterization of such document or writing or thing so as to identify it with reasonable particularity and shall include, without limitation, the following information with respect to each such document or writing:

a. The date appearing on said document or record, and if it has no date, the answer shall so state and shall give the date or approximate date the document, writing or thing was prepared.

b. The identity or descriptive code number, file number, title, or label of such document, writing or thing.

c. The general nature of description of said document and, if it is not signed, the answer shall so state and shall give the name of the person or persons who prepared it.

d. The name of the person, if any, to whom such document, writing or thing is addressed in the name of such person other than such address to whom such document or copies thereof, were given or sent, if any; and

e. The name and address of the person having present possession, custody, or control of such document, writing or thing.

"Documentation" or "Document" as used in these Requests/Interrogatories means the original or copies of any written, recorded or graphic matter, however produced or reproduced, including but not limited to, any book, pamphlet, online or

electronic forms, periodical, letter, correspondence, telegram, invoice, contract, purchase order, estimate, report, memorandum, inter-office communication, e-mail, working paper, record, study, paper, worksheet, estimating sheet, deed, bill, record, time card, work record, chart, graph, index, computer printout, data sheet, data processing card or tape, recording, text message, electronic document capable of reproduction on a computer, or transcription thereof, and all other memoranda or any conversations, meetings and conferences by telephone or otherwise, any other writing or reporting, however produced or reproduced, which is in your possession, custody or control, or in the possession, custody or control of any agent, officer, or employee of the answering party or the answering party's attorney(s).

***INTERROGATORY***

1. Provide the following identifying information:

   (a) Your name. MICHEALA MICHELLE LUDWICK

   (b) Your date of birth. 01/22/1997

   (c) Your residential address. 1128 Downer Ave., Lansing, MI 48912

   (d) Your Social Security Number. 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

   (e) Your Driver's License Number. See attached.

   (f) Each social media site and username. FB MICHEALA LUDWICK.

(g) Your spouse's full name.N/A

***ANSWER:*** PRODUCED. SEE ABOVE.

***REQUEST TO PRODUCE***

1. Please produce your driver's license, identification card, and all documents, records, writings and recordings of every kind and nature responsive to the previous request.

***ANSWER:*** ATTACHED.

***INTERROGATORY***

2. If you have ever been arrested, charged, indicted, or convicted of any crime provide the following:

(a) The nature of the offense for which you were arrested, charged, indicted, or convicted.

(b) The state, county, and municipality in which the offensive occurred.

(c) The court in which you were charged.

(d) The disposition of the criminal proceeding.

(e) The sentence imposed.

***ANSWER:***

**DISORDERLY** JULY 4, 2021. WALKING THROUGH WRONG AREA LAWN IN GRAND HAVEN. 58th DISTRICT COURT, HOLLAND, GRAND HAVEN, AND HUDSONVILLE COURT, PLED GUILTY. FINES AND COSTS. (CASE NO. UNAVAILABLE)

**ASSAULT AND BATTERY** JUNE 7, 2023, 65A DISTRICT COURT, ST. JOHNS, MI, PLED GUILTY FROM ORIGINIALLY CHARGED AGGRAVATED ASSAULT. 30 DAYS JAIL AND PROBATION. PLAINTIFF WAS CHARGED AFTER SHE PUSHED A WOMAN WHO CALLED HER A DIRTY NIGGER, KNOWING HER TO BE OF AFRICAN DECENT. THEN A MAN JUMPED IN AND TRIED TO DEFEND THE RACIST WOMAN AND PLAINTIFF MORE OR LESS DODGED HIS ADVANCES WITH A SHOULDER ROLL THAT SOMEHOW LED TO HIM HURTING HIMSELF.

PLAINTIFF MUST NOTE THAT THE JAIL TIME IMPOSED UNDERLYING THIS OFFENSE WAS QUESTIONABLE AS THE JUDGE WAS THE BROTHER IN LAW OF THE OWNER OF THE BAR WHERE THE CHARGES ORIGINATED AND USED HIS POSITION OF AUTHORITY TO FURTHER IMPOSE A STIGMA ON PLAINTIFF FOR HER RACE IN AN ENVIRONMENT WITH VERY MINIMAL IF ANY RACIAL DIVERSITY AND A VERY ANTIQUATED VIEWPOINT ON RACE RELATIONS.

***<u>REQUEST TO PRODUCE</u>***

2. Please produce copies of all documents, records, writings and recordings of every kind and nature evidencing your response to the previous interrogatory.

***<u>ANSWER:</u>*** ATTACHED. WILL SUPPLEMENT AS REQUIRED AND/OR AS APPROPRIATE AND DOCUMENTS ARE PUBLIC RECORDS EASILY IDENTIFIABLE AND PROCURABLE THROUGH APPROPRIATE PUBLIC BODY.

PLAINTIFF FURTHER RESERVES THE RIGHT TO USE THE VIDEO'S OF HER COURT PROCEEDINGS TO PROVE BIAS, ALONG WITH THE COURT PROCEEDINGS OF HALLEY ESSENBERG TO SHOW COMMON PLAN OR SCHEME.

***INTERROGATORY***

3. Provide a complete description of your educational history including the name of each school, community college, college, graduate college, and technical training institution you attended, the dates of attendance, the year of completion, and identify each degree, certificate, and designation you obtained.

***ANSWER:*** **TRUMAN MIDDLE COLLEGE HIGH SCHOOL**, 1145 W WILSON AVE, CHICAGO, ILINOIS (773) 907-4840. GRADUATED 2015.

**MICHIGAN STATE UNIVERSITY**, BACHELORS IN POLITICAL SCIENCE, 2020

**UNIVERSITY OF ARIZONA**, MASTERS IN HUMAN RESOURCES, 2024.

***INTERROGATORY***

4. Describe each physical and psychological/emotional injury you claim to have suffered arising out of the incident set forth in the underlying Complaint.

***ANSWER:*** THE PRE-EXISTING UNDERLYING MENTAL HEALTH DIAGNOSES INCLUDE INCREASED ANXIETY TO THE POINT OF AGORAPHOBIA AND FEAR OF LEAVING HOME. LUDWICK EXPERIENCED AN OVERALL LACK OF ABILITY TO APPRECIATE AND OR ENJOY NORMAL ACTIVITIES WITHOUT PERVASIVE FEAR OF SOCIAL SITUATIONS AND/OR FEAR OF SUFFERING A DEBILITATING AND EMBARASSING SEIZURE IN PUBLIC

LUDWICKS SEVERE 3 MINUTE GRAND MAL SEIZURE THAT WAS WITNESSED AT CCJ AND IS AVAILABLE BY VIDEO SHOWS HOW BAD THE SEIZURE ACTUALLY WAS. NURSE DAWN SWANSON WITNESSED THE SEIZURE, YET SHE COMMUNICATED TO EMS THAT SHE BELIEVED IT WAS JUST A PANIC ATTACK. IT WAS CLEARLY A SEIZURE AND

INSTEAD INSTRUCTING EMS THAT THIS WAS A PANIC ATTACK.

CCJ STAFF'S, PARTICULARLY NURSE DAWN SWANSON, WHOSE CARE WAS DELIBERATLEY INDIFFERENT, IMPARTIAL, COLD, AND CRIMINAL, PROVIDED IMPLAUSABLE EXPLANATIONS THAT ONLY SERVED TO FURTHER UNDERMINE PLAINTIFF'S MEDICAL CARE AND IMPLICATE THEIR DELIBERATE INDIFFERENCE TO THE PLAINTIFF'S MEDICAL NEEDS

FOLLOW THE PATTERN AND THE WEAKNESSES IN THE SYSTEM BECOME GLARING. CCJ IS NOT ONLY ILL-EQUIPED TO PROVIDE BASIC HEALTH CARE BUT THEY ARE NOT TRAINED AND/OR INCLINED TO PROVIDE ANY CARE TO INMATES, INSTEAD LABELING THEIR BEHAVIOR AS NORMAL CORRECTIONAL BEHAVIOR,

EVEN IN SPITE OF WILL ADAMS SCATHING REPORT REGARDING THE STATE OF THE CLINTON COUNTY JAIL IN 2019 THAT PERVADED INTO PLAINTIFF'S UNFORTUNATE AND ARGUABLE CRIMINAL TREATMENT AT THE CCJ THAT LED TO THE SIGNIFICANT INCREASES IN EMOTIONAL AND MOOD DYSREGULATION AND INCREASED NEED FOR TREATMENT.

***REQUEST TO PRODUCE***

3. Please produce copies of all documents, records, writings and recordings of every kind and nature evidencing your physical and psychological/emotional injuries.

***ANSWER:*** ATTACHED. PLAINTIFF WILL PROVIDE ACCESS TO HER SPARROW MY HEALTH PATIENT PORTAL UPON REQUEST TO VIEW ALL VISITS ASSOCIATED WITH SPARROW HOSPITAL AND URGENT CARES AND ASSOCIATED ENTITIES.

***INTERROGATORY***

5. Identify by name, address, and telephone number each hospital, emergent care facility, clinic, practice, doctor, psychiatrist, psychologist, therapist, social worker, counselor, caregiver, and medical/psychological provider who examined, attended, evaluated, counseled, treated or examined you because of this incident providing:

(a) The date of each visit.

(b) The reason/purpose for each visit.

(c) The diagnosis, care and treatment provided; and

(d) The sums of money paid by yourself and through insurance.

***ANSWER:*** BECAUSE OF THIS ACCIDENT.

**LIFE STANCE THERAPY**, 1400 ABBOT RD., STE 400, EAST LANSING, MI 48823. LUDWICK PARTICIPATED IN COUNSELING WITH 2 DIFFERENT THERAPISTS BUT WAS DISSUADED TO CONTINUE THERAPY BECAUSE HER THERAPIST ASKED HER OUT ON A DATE AND WAS "CREEPY" WHICH MADE LUDWICK FEEL VERY VULNERABLE AS A RESULT OF HER SHARING SUCH TRAUMATIC AND PERSONAL DETAILS WITH A PROFESSIONAL WHO USED HIS POSITION TO TRY AND BECOME PERSONALLY INVOLVED.

***REQUEST TO PRODUCE***

4. Please execute and return the attached authorizations for the release of records from each medical/psychological provider identified in response to the previous interrogatory and produce copies of all records and reports from each

medical/psychological provider.

***ANSWER:*** ATTACHED. PLAINTIFF WILL SUPPLEMENT AS APPROPRIATE OR UPON REQUEST.

***INTERROGATORY***

6. Identify by name, address, and telephone number each hospital, emergent care facility, clinic, practice, doctor, psychiatrist, psychologist, therapist, social worker, counselor, caregiver, and medical/psychological provider who examined, attended, evaluated, counseled, treated or examined in the previous twenty (20) years:

(a) The date of each visit.

(b) The reason/purpose for each visit.

(c) The diagnosis, care and treatment provided; and

(d) The sums of money paid by yourself and through insurance.

***ANSWER:*** LUDWICK HAS PROVIDED MOST MEDICAL RECORDS THAT ARE REMOTELY RELEVANT TO THIS INQUIRY, WILL ALLOW ACCESS TO MYSPARROW CHART, AND WILL UPLOAD WHOLE MEDICAL HISTORY WHEN SPARROW PROCESSES THE REQUEST.

MICHEALA MEDICAL (SPARROW MICHIGAN HEALTH SYSTEMS)

DR. LISA M. EDGERTON DO
DR. WHITNEE ESSENMACHER MD
DR. MARK WEISMILLER MD
DR. PRECIOUS OLOWOOKERE MD
DR. MYTHRI A. RAMEGOWDA MD
DR. KARAM GAGI MD
DR. MATTHEW MCCLURE
DR. DEAVID BETTEN MD
DR. VICTOR ELGABALAWI MD

**HEALTHY MINDS PSYCHIATRIC AND TMS CENTER**, 2150 ASSOCIATION DR., STE 100, OKEMOS, MI 48864. (**DR. ZULFIQAR AHMED MD** – CERTIFIED PSYCHIATRIST). GENERAL PSYCHIATRY AND THERAPY. YEARS

A PSYCHIATRIST IN CHICAGO THAT SHE CANNOT RECALL.

***REQUEST TO PRODUCE***

5. Please execute and return the attached authorizations for the release of records from each medical/psychological provider identified in response to the previous interrogatory and produce copies of all records and reports from each medical/psychological provider.

***ANSWER:*** ATTACHED. PLAINTIIFF WILL SUPPLEMENT BASED UPON CONTINUED DISCOVERY AS APPROPRIATE AND REQUIRED.

***REQUEST TO PRODUCE***

6. Provide your medical insurance card for your current medical insurance provider and each of your medical insurance providers for the previous twenty (20) years.

***ANSWER:*** ATTACHED.PLAINTIFF WILL SUPPLMENT IF REQUIRED AND/OR APPROPRIATE.

***INTERROGATORY***

7. Do you, or does anyone on your behalf, contend that, as a result of the injuries sustained in the incident herein sued upon, there has been any aggravation

of a pre-existing condition (whether a prior illness, disease, injury, or a mental, nervous, or psychological condition)? If so, please identify specifically the condition which has been aggravated, when you were first advised or became aware that such a pre-existing condition existed and the name, address and telephone number of each medical/psychological provider who diagnosed the condition and/or injury, and the name, address and telephone number of each medical/psychiatric provider who diagnosed aggravation of the condition.

***ANSWER:*** GENERALIZED ANXIETY DISORDER, OBSESSIVE COMPULSIVE DISORDER, AND SOCIAL ANXIETY WAS SIGNIFICANTLY HEIGHTENED AND INCREASED EXPONENTIALLY AFTER THE SEIZURE TO THE EXTENT THAT PLAINTIFF'S MEDICAL STATE COULD BE DESCRIBED AS AGORAPHOBIC AS CAN BE ATTESTED TO BY HER TREATING PSYCHIATRIST SINCE THE SEIZURE AT THE CCJ. SHE HAS RECURRENT AND PERVASIVE THOUGHTS REGARDING THE EXPERIENCE LEADING UP TO THE SEIZURE AND HER FORCED CONTAINMENT FOR "MEDICAL OBSERVATION" IN THE RECEIVING CELLS THAT DID LITTLE MORE THAN ADD INSULT AND TRAUMA TO AN ALREADY SIGNIFICANT EXACERBATION OF A SEROUS UNDERLYING AND PREVIOUSLY DIAGNOSED MENTAL HEALTH CONDITION THAT APPEAR TO MANIFEST IN THE FORM OF PTSD AS CAN BE ATTESTED TO BY HER CLINICAL DOCTORS.

PLAINTIFF HAS AN EXCESSIVE FIXATION ON HER FEAR OF DRIVING DUE TO THE POSSIBILITY OF HAVING A SEIZURE DO TO CCJ'S DELIBERATE INDIFFERENCE. PLAINTIFF HAS HAD A VERY DIFFICULT TIME SINCE THE CCJ SEIZURE ADJUSTING TO WORKING IN STRUCTURED ENVIRONMENTS THAT INVOLVE A LARGE NUMBER OF PEOPLE DUE TO THE STIGMA FROM BEING IN JAIL AND RECURRENT TRAUMA.

LUDWICK NOT ONLY SUFFERED THE SEVERE AND DEBILITATING SEIZURE WHILE IN JAIL, BUT SHE ALSO HAD A SIGNIFICANT SEIZURE WHILE WORKING THAT REQUIRED EMS TO RESPOND TO HER

EMPLOYMENT TO RENDER EMERGENCY SERVICES FOLLOWED UP BY AN ADMIT TO THE HOSPITAL. IN FEBRUARY 2025, LUDWICK HAD A SIGNIFICANT SEIZURE WHILE AT HOME BUT WAS UNABLE TO GET MEDICAL ASSISTANCE SO SHE JUST HAD TO LET IT PASS, WHICH WAS TERRIFYING.

RESPONSE SUBJECT TO FURTHER DISCOVERY AND PLAINTIFF WILL SUPPLEMENT RESPONSE AS REQUIRED AND/OR AS APPROPRIATE.

***REQUEST TO PRODUCE***

7. Please execute and return the attached authorizations for the release of records from each medical/psychological provider who diagnosed an aggravation of the condition as identified in response to the previous interrogatory and produce copies of all records and reports from each medical/psychological provider.

***ANSWER:*** ATTACHED. EXECUTED AND RETURNED. WILL SUPPLEMENT AND/OR PROVIDE RELEASES UPON REQUEST.

***INTERROGATORY***

8. If you have been scheduled or told by any medical or psychological provider that you will need additional treatment in the future, please identify the name of the provider, the type of future treatment necessary, and the date or dates of all future treatment scheduled.

***ANSWER:*** **HEALTHY MINDS PSYCHIATRIC AND TMS CENTER**, 2150 ASSOCIATION DR., STE 100, OKEMOS, MI 48864. (**DR. ZULFIQAR AHMED MD** – CERTIFIED PSYCHIATRIST). GENERAL PSYCHIATRY AND RESUMPTION OF THERAPY FOLLOWING A COUPLE BAD EXPERIENCES WITH THERAPISTS WHO ASKED HER OUT AND WERE “CREEPY”. SHE

SAW MULTIPLE THERAPISTS AFTER THE INCIDENT AND HASN'T BEEN ABLE TO FIND A GOOD FIT BUT IS STILL TRYING THROUGH HEALTHY MINDS NOW AS SHE HAS GOTTEN A BENEFIT FROM THERAPY BUT HASN'T BEEN ABLE TO CONNECT WITH AN APPROPRIATE THERAPIST, AND WHILE DISCOURAGED SEES THE EFFICACY IN PSYCHOTHERAPY.

LUDWICK HASN'T BEEN PROVIDED ANY OTHER CARE OUTSIDE THE SPARROW UNIVERSITY OF MICHIGAN HEALTH SYSTEM SO ALL OF HER RECORDS ARE IN SPARROW MYCHART AND COUNSEL WILL ALLOW DEFENDANT TO ACCESS MYCHART AND HAS ALSO REQUESTED A FULL MEDICAL HISTORY THAT WILL BE TURNED OVER WHEN PREPARED BY SPARROW.

***REQUEST TO PRODUCE***

8. Please execute and return the attached authorizations for the release of records from each medical/psychological provider identified in response to the previous interrogatory and produce copies of all records and reports from each medical/psychological provider.

***ANSWER:*** PREVIOUSLY PROVIDED BUT WILL SUPPLEMENT AND PROVIDE ANY ADDITIONAL RELEASES AS DEEMED APPROPRIATE BY THE CLINTON COUNTY DEFENDANTS.

***INTERROGATORY***

9. Identify the name, address, and telephone number of your current employer and each of your previous employers for the past 15 years. For your current and each previous employer provide the following information:

(a) Your date of hire.

(b) Your date of termination.

(c) Reason for termination.

(d) Job title.

(e) Job duties.

(f) Salary or hourly rate of pay.

(g) Annual income.

***ANSWER:*** 2018 TO PRESENT -- **MICKY'S BAR**, 11189 OLD US 27, DEWITT, MI 48820, (517) 669-9171, BAR MANAGER, FAMILY-OWNED ESTABLISHMENT.

2026 -- **JACKSON NATIONAL LIFE**, 1 CORPORATE WAY, LANSING, MI 48951, DATA ENTRY, (517) 381-5500,

2026 -- **FELDMAN CHEVROLET**, 2801 E MICHIGAN AVE., LANSING, MI 48912, (517) 489-4858,

2023 **LAFCU**, 106 NORTH MARKETPLACE BLVD, LANSING, MI 48917, (517) 622-6600, TELLER

***REQUEST TO PRODUCE***

9. Please execute and complete the attached authorizations for release of records from each of your current and previous employers identified in response to the previous interrogatory and produce copies of all documents, records, writings and recordings of every kind and nature evidencing your pay, wages, rate of pay, salary, and income from each of your current and previous employers.

***ANSWER:*** ATTACHED AND/OR PREVIOUSLY PROVIDED AND WILL SUPPLEMENT AND SIGN ANY RELEASE UPON REQUEST.

***INTERROGATORY***

10. ~~If you are claiming that you have lost any time from work as a result of the incident herein sued upon, please indicate the amount of time lost from work, the dates on which you missed work, the reasons for which you missed work, and your hourly, weekly and/or monthly rate of pay, providing specifically the amount of income you claim to have lost as a result of the incident herein sued upon.~~

***ANSWER:*** N/A

***REQUEST TO PRODUCE***

10. ~~Please produce copies of all documents, records, writings and recordings of every kind and nature identifying your wage loss and lost income resulting from the incident described in your Complaint~~.

***ANSWER:*** N/A

***REQUEST TO PRODUCE***

11. Please execute and complete the attached authorization for release of your state and federal income tax records, all reports and documents filed with the State of Michigan Department of Treasury and the Internal Revenue Service for each of the previous ten (10) years.

***ANSWER:*** ATTACHED. WILL SIGN ANY FUTURE RELEASE UPON REQUEST.

***INTERROGATORY***

11. To the extent that you seek damages for past, present, and/or future loss of earnings and earnings capacity, including the loss of any business opportunity, please provide the following information:

(a) Identify the source and amount of all past, present, and future loss of earnings.

(b) Identify the source and amount of all past, present, and future loss of earnings capacity.

(c) Identify the source and amount of all past, present, and future loss of opportunity of acquiring contacts, information, and potential clients.

(d) Identify by name, address, and telephone number each person with knowledge and information which will support these claims.

***ANSWER:*** NOT REQUESTING LOSS OF EARNING OR BUSINESS OPPORTUNITY DAMAGES

***REQUEST TO PRODUCE***

12. Produce copies of all documents, records, writings and recordings of every kind and nature identifying your claims for past, present and/or future loss of earnings and earnings capacity.

***ANSWER:*** NOT REQUESTING DAMAGES FOR LOSS OF EARNING CAPACITY AT THIS TIME SUBJECT TO CONTINUED DISCOVERY AND POTENTIAL SUPPPLEMENT.

***INTERROGATORY***

12. ~~Itemize all other expenses and losses which you claim to have incurred because of the incident herein sued upon.~~

***ANSWER:*** *N/A*

***REQUEST TO PRODUCE***

13. ~~Produce copies of all documents evidencing all items of expenses and losses which you claim to have incurred because of this incident.~~

***ANSWER:*** N/A

***INTERROGATORY***

13. Please list the name, address and telephone number, substance of knowledge, bases for knowledge, and anticipated testimony (if known) of each witness to the underlying incident upon which this litigation is based and each witness who has information or knowledge relating to the facts and occurrences outlined in your Complaint or any other element of this claim, including the damages you allegedly sustained.

***ANSWER:*** PLEASE FIND **WITNESS LIST** ATTACHED. THIS ANSWER IS SUBJECT TO FURTHER DISCOVERY AND PLAINTIFF WILL SUPPLEMENT AS APPLICABLE.

***REQUEST TO PRODUCE***

14. Produce copies of all witness statements and written statements made by you.

***ANSWER:*** N/A WILL SUPPLEMENT APPROPRIATELY

***INTERROGATORY***

14. ~~If you have ever made a claim (including a workers compensation claim) or filed a lawsuit against any person or entity, please identify the names of the parties involved, the dates upon which the claim or Complaint was filed, the Court in which each action was prepared, the case number and caption of the litigation and the status and/or result of that claim or lawsuit, including any disposition, judgment settlement or reward and the nature of every injury and damage you sustained.~~

***ANSWER:*** N/A

***REQUEST TO PRODUCE***

~~15. Please produce copies of all records, documents, pleadings, writings, recordings, and correspondence of every kind and nature regarding all claims (including Worker's Compensation), lawsuits, and litigation in which you have been involved.~~

***ANSWER:*** N/A

***INTERROGATORY***

15. Provide the name, address and telephone number of each person retained by you or your counsel to be called as an expert witness in the above-entitled litigation. For each person identified, state the subject matter about which the expert is expected to testify and the substance of all facts and opinions to and about which the expert is expected to testify and provide the grounds for each opinion.

***ANSWER*:** **WILL ADAMS**, CORRECTIONAL LITIGATION SOLUTIONS, 15750 TIMBER TREK WAY, MONUMENT, CO 80132, W.ADAMS@CORRLITSOLUTIONS.COM. TESTIFY AS TO LACK OF EFFECTIVE AND PRUDENT POLICIES AND SYSTEMATIC FAILURES LEADING TO THE INCREASED RISK TO INMATES AND THEIR EVENTUAL DEATH AND/OR INJURY. PURPOSE OF HOLDING CELLS IS NOT FOR MEDICAL OBSERVATION AND MONITORING.

THE OPERATIONS IN 2023 AT THE CCJ WERE CONSISTENT WITH THE OPERATIONS IN 2019. THE POLICIES AS THEY ARE ON THE BOOKS AND AS THEY WERE CUSTOMARILY PRACTICED IN A MANNER THE SAME AS IS REPORTED IN MR. ADAMS PREVIOUS STUDY.

THE CCJ DID NOT MAKE NECESSARY CHANGES THAT WERE EASILY IDENTIFIABLE BECAUSE THEY WERE ADDRESSED BY ISSUES PRECIPITATING MULTIPLE PRIOR LAWSUITS AND AFTER THE MARCH 14, 2019, MEMO SENT TO COUNTY COMMISSIONERS BY SHERIFF LAWRENCE JERUE OUTLINING THE ABHORRENT CARE HEHRER RECEIVED FROM CCJ STAFF AND ACH PERSONNEL. THE SUBSTANCE OF THE CUSTOMS AT CCJ SHOWS A CONTINUED PATTERN OF CCJ FAILING TO VALUE HUMAN LIFE AND DIGNITY AND BEING DELIBERATELY INDIFFERENT TO THEIR BASIC NEEDS.

MR. ADAMS IN HIS PREVIOUS REPORT THAT IS ATTACHED

HERETO AND INCORPORATED HEREIN BY REFERENCE THAT JOSEPH HEHRER'S DEATH WAS ATTRIBUTABLE TO CCJ LACK OF ABILITY TO RECOGNIZE THE HUMANITY OF PERSONS WHO ARE DETAINED UNDER THEIR CARE AND CUSTODY. THE LEVEL OF MEDICAL CARE PROVIDED BY ACH AMOUNTED TO A DELIBERATE INDIFFERENCE STANDARD PROVEN BY THE UTTER RELUCTANCE OF THE CCJ AND/OR ACH IMPLEMENT ANY COLLABORATIVE POLICIES AND/OR TO DOCUMENT ANY EVENTS REGARDING INMATES INCLUDING BOTH MAJOR AND MINOR MEDICAL EVENTS.

CCJ'S CUSTOM OF REFUSING TO SEND OUT SICK INMATES BECAUSE OF THE POSSIBILITY THEY ARE PLAYING POSSUM OR FAKING BASED UPON BOTH WHAT NURSE THELEN AND DR. PARKER TESTIFIED TO IN PRIOR DEPOSITIONS. OR CCJ DEPUTY THAT SAID THAT IF SOMEONE WAS SICK ON NIGHTSHIFT AND ASKED TO GO TO THE HOSPITAL HE WOULD ASK THE INMATE TO DEFINE "HOW SICK"

BOOKING IS ABHORRENT AS DESCRIBED IN THE NARRATIVE SECITON ENTITLED BOOKING

***REQUEST TO PRODUCE***

16. Produce copies of all documents, records, writings, materials, drawings, depictions, photographs, and videotapes taken or used by each expert witness, relied upon by each expert witness in formulating his or her opinions, and all reports or writings prepared by each expert witness.

***ANSWER:*** ATTACHED. PLAINTIFF WILL SUPPLEMENT AS REQUIRED AND/OR AS APPLICABLE SUBJECT TO ANALYSIS AND REPORT BASED UPON FURTHER ANTICIPATED DISCOVERY TO BE TURNED OVER BY DEFENDANTS.

***INTERROGATORY***

16. ~~Please indicate if you have ever applied for Social Security Disability~~

~~Benefits. If so, indicate the date of application, the nature and extent of the disability claimed, the name of each medical provider who examined or evaluated you, and indicate whether you were awarded benefits, the date of the award, and the benefit received.~~

***ANSWER:*** NEVER APPLIED

***REQUEST TO PRODUCE***

17. ~~Please execute and return the attached authorizations for the release of all documents, records, writings and recordings of every kind and nature evidencing your application(s) for Social Security Disability Benefits as identified in your response to the previous interrogatory and produce copies of all records regarding the outcome of your application(s) and any benefits received~~.

***ANSWER:*** PREVIOUSLY PROVIDED AND/OR WILL PROVIDE ADDITIONAL RELEASES UPON REQUEST.

***INTERROGATORY***

17. In Count I of your Complaint, you allege Fourth Amendment, Fifth Amendment, and Fourteenth Amendment violations against Defendants for not allowing Plaintiff, “transfer by medical personnel to the hospital”. In relation to these allegations, please provide the following information:

(a) Identify by name, each Defendant who allegedly violated your

Fourth Amendment rights

(b) Identify each right secured by the Fourth Amendment that each Defendant violated and describe factually how you were deprived of the right and the injury you sustained.

(c) Identify each act, action and occurrence taken by each Defendant which you claim violated each right secured by the Fourth Amendment and describe how each act caused or contributed to the resulting injury.

(d) Identify by name, each Defendant who allegedly violated your Fifth Amendment rights.

(e) Identify each right secured by the Fifth Amendment that each Defendant violated and describe factually how you were deprived of the right and the injury you sustained.

(f) Identify each act, action and occurrence taken by each Defendant which violated each right secured by the Fifth Amendment and how each act caused and or contributed to the resulting injury.

(g) Identify by name, each Defendant who allegedly violated your Fourteenth Amendment rights.

(h) Identify each right secured by the Fourteenth Amendment that each Defendant violated and describe factually how you were

deprived of the right and the injury which you sustained.

(i) Identify each act, action and occurrence taken by each Defendant which you claim violated each right secured by the Fourteenth Amendment and how each act contributed to the resulting injury.

(j) Identify by name, address, and telephone number each witness to with knowledge and/or information supportive of your allegations regarding each constitutional violation and each supportive of each subpart of this interrogatory.

(k) Identify by name address and telephone number each witness with knowledge and/or information supportive of your claims of each injury you sustained in relation to each alleged constitutional violation.

***ANSWER:*** 4TH, 14TH, AND 5TH

***REQUEST TO PRODUCE***

18. Produce copies of all documents, records, writings and recordings of every kind and nature, including audio, video, photographs, drawings, and depictions of every kind, relating to your response to the previous Interrogatory and each of its separate subparts.

***ANSWER:*** ATTACHED. PLAINTIFF WILL SUPPLEMENT AS REQUIRED AND/OR APPROPRIATE.

***INTERROGATORY***

18. In Count I of your Complaint, you allege deliberate indifference to serious medical needs against Defendants. In relation to these allegations, please provide the following information:

(a) For each Defendant, identify each fact known to each Defendant and the time each Defendant became aware of each fact regarding each of Plaintiff's objectively serious medical conditions, and her use of Xanax.

(b) For each Defendant, identify all facts which were conveyed to each Defendant (and the time each fact was conveyed) regarding Plaintiff's objectively serious medical condition and her use of Xanax.

(c) Identify each act, action, inaction, and occurrence which you attribute to each Defendant which constitutes deliberate indifference to Plaintiff's serious medical needs and her use of Xanax.

(d) Identify each act, action, and inaction of each Defendant which constitutes "intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights".

(e) Identify each act and action each Defendant should have taken in relation to Plaintiff's serious medical condition.

(f) Identify by name, address, and telephone number each person with knowledge and/or information supporting Plaintiff's claims of deliberate indifference of a serious medical condition.

(g) Identify each injury Plaintiff sustained because of each Defendant's deliberate indifference of Plaintiff's serious medical condition.

***ANSWER:*** ANSWER deliberate indifference

***REQUEST TO PRODUCE***

19. Produce copies of all documents, records, writings and recordings of every kind and nature evidencing your response to the previous interrogatory and each of its subparts.

***ANSWER:*** ATTACHED. PLAINTIFF WILL SUPPLEMENT AS REQUIRED AND/OR APPROPRIATE.

***INTERROGATORY***

19. In Count II of your Complaint, you allege Plaintiff's Eighth Amendment rights were violated by Defendants resulting in cruel and unusual punishment because of Defendants' "willful, systematic, and deliberate indifference

to her basic needs". In relation to these allegations, please provide the following information:

(a) Identify factually, each act, action and occurrence of cruel and unusual punishment and each failure to act which you attribute to each Defendant identifying separately each act of each Defendant.

(b) Identify all facts and evidence that support you claims of "willful, systemic, and deliberate indifference to basic needs" which you attribute to each and all Defendants.

(c) Identify by name, address, and telephone number each witness to each act, action, occurrence, and failure to act, which you attribute to each Defendant.

(d) Identify each injury Plaintiff sustained in relation to each act, action, and occurrence, and failure to act, which you attribute to each Defendant, separately.

***ANSWER:*** Eight Amendment Rights

***REQUEST TO PRODUCE***

20. Produce copies of all documents, records, writings and recordings of every kind and nature evidencing your response to the previous Interrogatory and

each of its subparts.

***ANSWER:*** ATTACHED. PLAINTIFF WILL SUPPLEMENT AS REQUIRED AND/OR AS APPROPRIATE.

***INTERROGATORY***

20. In paragraph 15 of your Complaint, you allege Monell violations against the Clinton County. In relation to these allegations, please provide the following information:

(a) Identify every policy, practice, and custom, which violates the Constitution, and which caused or contributed to the Constitutional deprivations complained of herein.

(b) Identify each inadequacy in the training of Clinton County Jail staff, which caused or contributed to the Constitutional deprivations complained of herein.

(c) Identify each historic Constitutional deprivation caused by the inadequacy of training, which provided notice to Defendant Clinton County that its training program was constitutionally inadequate.

(d) Identify each recurring situation presenting an obvious potential for risk and violation of rights, relating to Defendant Clinton County's training or policies.

(e) Identify all facts and evidence which demonstrate a causal connection between each policy, practice and custom and the Constitutional deprivation alleged herein.

(f) Identify all facts and evidence which demonstrate a causal connection between each inadequacy in the training program which caused or contributed to the Constitutional deprivation claimed herein.

(g) Identify by name, address, and telephone number, each person with knowledge and information supportive of your allegations of a policy, practice or custom which violates the Constitution and supportive of your allegations of a causal connection between each policy, practice or custom and the Constitutional deprivation

***ANSWER:*** AS MORE ARTFULLY LAID OUT AND ANALYZED IN THE NARRATIVE BELOW.

1997 DOUGLAS MCPHERSON
1998 THOMAS CENSKE
2004 TOMAS CENSKE
MARCH 14, 2019, JOSEPH HEHRER
2021 DEATH (SUBJECT TO DISCOVERY)
DECEMBER 14, 2022, CHRISTOPHER FISHER
JUNE 10, 2023, MICHEALA LUDWICK
MARCH 24, 2024, HAYLEY ESSENBERG
JUNE 14, 2024, NATHAN SMITH
DECEMBER 17, 2025, DAMEON GORE
NOVEMBER 19, 2006, CHRISTOPHER CORBIN

2016 JAMES HINTON
2014 DANIELD PFEIFER
2010 ERROL MAREL TRAVIS
DAVID CARSON

ANY AND ALL CASES UNCOVERED IN DISCOVERY, INCLUDING BUT NOT LIMITED TO THE INSTANCES INCLUDED IN THE ALLEGATIONS CONTAINED IN THE COMPLAINT, THAT HAVE YET TO BE FULLY DEVELOPED.

***REQUEST TO PRODUCE***

21. Produce all copies of documents, records, writings, and recordings of every kind and nature, evidencing the information requested in the previous interrogatory and each of its subparts.

***ANSWER:*** ATTACHED. PLANTIFF WILL SUPPLMENT REPSONSE AS REQUIRED AND/OR AS APPROPRIATE.

***INTERROGATORY***

21. In paragraph 26 of your Complaint you allege that your quality of life has declined because of physical and mental/emotional injuries you suffered at Clinton County Jail and the stigma you carry with you as a result. Please describe in detail the injuries you sustained and how each injury has caused the decline of your quality of life.

***ANSWER:*** that YOUR QUALITY OF LIFE HAS DECLINED BECAUSE OF PHYSICAL AND MENTAL/EMOTIONAL INJURIES YOU SUFFERED AT CLINTON COUNTY JAIL AND THE STIGMA YOU CARRY WITH YOU AS A RESULT. **DAMAGES**

SEIZURE – PATIENT CANT DRIVE, SWIMMING STANDING ATOP HEIGHTS, OPEN FIRES, OR BE AROUND OTHERS WHO HAVE SEIZURES FOR FEAR OF CAUSING A RECURRENT SEIZURE.

KEPPRA AND MEDICATIONS SIDE EFFECTS INCLUDING SEVERE MOOD CHANGES.

PRE-EXISTING – JANUARY 28, 2023, ANXIETY AND SCRIPT FOR XANEX.

2 RECURRENT SEIZURES, 1 AT HOME AND 1 AT WORK LEADING TO HOSPITALIZATION dated --- THE MEDICAL STAFF NOTATED AT THE SECOND THAT THE PRIOR SEIZURE THAT OCCURRED AT THE CCJ OCCURRED IN A SETTING OF DECREASED SLEEP AND MALNUTRITION SIMILAR SEIZURE IN ED

***<u>REQUEST TO PRODUCE</u>***

22. Produce all copies of documents, records, writings, and recordings of every kind and nature, evidencing the information requested in the previous interrogatory.

***<u>ANSWER:</u>*** ATTACHED. WILL PROVIDE ACCESS TO SPARROW MY HEALTH PATIENT PORTAL UPON REQUEST. FURTHER, PLAINTIFF WILL UPLOAD COMPLETE SPARROW RECORD AFTER IT IS MADE AVAILABLE THROUGH THE MYPORTAL.

***<u>REQUEST TO PRODUCE</u>***

23. Produce all copies of documents, records, writings, and recordings of every kind and nature, evidencing your allegation in paragraph 27 of your Complaint that Clinton County Jail's policy that "inmates don't deserve basic human and medical necessities and should suffer while incarcerated regardless of particularized

need".

***ANSWER:*** DELIBERATE INDIFFERENCE TO THE NEEDS OF ALL THE INMATES CITED IN THE NARRATIVE. SPECIFICALLY, BOOKING PROCEDURES, SUPERVISION AND MONITORING, OVERALL ACCESS TO MEDICAL, FORCING INMATES TO LAY IN THEIR VOMIT AS WAS THE CASE IN HEHRER AND ESSENBERG, WITH ESSENBERG STATING THAT THE STENCH OF VOMIT IN THE RECEIVING CELL WAS STRONG AND REPUGNANT. HEHRER BEING ENTIRELY AVOIDED FOR WEEKS WHILE HE WASTE AWAY OF A SIMPLE CONDITION THAT WENT UNDIAGNOSED BECAUSE EVEN THE MOST REMEDIAL OF TESTS WASN'T ADMINISTERED BECAUSE CCJ'S LACK OF AN INFIRMARY MORE THAN SACRIFICES PATIENT CARE AND FURTHER SUPPORTS THE CONTENTION OF DELIBERATE INDIFFERENCE BY BOTH CCJ STAFF AND ACH PERSONNEL.

***REQUEST TO PRODUCE***

24. Produce copies of all documents which evidence your damage claims including your claims for compensatory damages, exemplary damages, punitive damages, costs, and attorney fees.

***ANSWER:*** ATTACHED. PLAINTIFF WILL SUPPLEMENT AS REQUIRED AND/OR AS APPROPRIATE.

**a. Pain and Suffering and Mental Anguish.** *Essenberg's* deteriorating medical condition from the time she was first processed in to until she received emergency medical attention from the lack of care and treatment resulted in her hospitalization and resultant loss of pulse ("*Flat Line")* event. She had been held at the CCJ for 6 days of torture before the *Flat Line*. Based upon same principles in the 6th Circuit Case *Gibson v. Moskowitz*, Nos 07-1074/1198 (2008) where $2,000,000.00 in compensatory damages was awarded accounting for inflation that merits an award of **$3,126,448.09**.

**b. Future Medical, Rehabilitation, and Increased Susceptibility**. Medical costs in the future will need to account for worse prognosis because of *Essenberg's* injuries. A *Flat Line* event is severe and often fatal and significantly increases risks of mortality, recurrent cardiac events and potential problems with the *Limbic* system and merits an award of **$1,000,000.00.**

**c. Fright and Shock.** The thought of impending death I'm sure makes you recall all events in your life, but it also makes you scared as hell and would forever change anyone's

perspectives. Past emotional distress from the enormity of feeling like you are about to die and then actually losing a pulse is extremely scary, especially for someone has to rely on a defibrillator to kick in at the right time. The incredibly unnecessary nature of this incident and the grave depravity involved merits an award of **$750,000.00.**

**d.** **Aggravation of a Preexisting Injury**. Aggravation of preexisting Depression and Anxiety. **$500,000.00.**

**e.** **Loss of Enjoyment of Life** and Essenberg now fears strenuous activity for fear of a recurrent event that could be catastrophic and lead to death, stroke, and/or heart event**.** Yearly per diem amounts to $50,000.00 per year for 49 years based on actuarial tables. This amount is partially determined because it was roughly the amount that was provided through unemployment during covid as a rough estimate of the value of what an individual needs to live a comfortable life. Loss of Enjoyment of life merits an award of $2,450,000.00 with a present day value of **$926,929.00.**

**f.** **Exemplary Damages** This case is egregious as evidenced by the Judge presiding over her bond violation hearing delaying the hearing so she could receive immediate medical attention due to her obvious dire need for medical care and the number of other similar instances of people be severely injured or end up dead in the CCJ. The 6th Circuit upheld a $3,000,000.00 exemplary damages award in another egregious deliberate indifference case. *Gibson v. Moskowitz*, Nos 07-1074/1198 (2008) The present day value merits an award of **$4,689,672.14** (Avg Inflation Rate 2.3%)

***REQUEST TO PRODUCE***

25. ~~Produce copies of all documents which evidence your out-of-pocket expenses and incidental expenses associated with this litigation.~~

***ANSWER:*** NOT REQUESTED IN THIS LITIGATION

***REQUEST TO PRODUCE***

26. Produce copies of all documents which you may introduce or rely upon for purposes of trial and/or this litigation.

***ANSWER:*** ATTACHED. EXHIBIT LIST ATTACHED, SUBJECT TO FURTHER DISCOVERY AND PLAINTIFF WILL SUPPLEMENT RESPONSE AS REQUIRED AND/OR AS APPROPRIATE.

***REQUEST TO PRODUCE***

27. Produce copies of all tangible materials which you may introduce or rely upon in this litigation.

***ANSWER:*** ATTACHED. PLAINTIFF WILL SUPPLEMENT AS REQUIRED AND/OR AS APPROPRIATE.

***REQUEST TO PRODUCE***

28. Produce copies of all documents, electronically stored information and tangible things in your possession related to this litigation.

***ANSWER:*** ATTACHED TO GREATEST EXTENT POSSIBLE. PLAINTIFF WILL SUPPLEMENT AS IS REQUIRED AND/OR AS APPLICABLE.

# CCJ– THE HOUSE OF HORRORS AND TORTURE

**Answer to questions17,18, 19, 20, 21 narratives for ease of responding.**

CCJ staff's treatment of inmates amounted to a house of horrors by their use of holding cells, inappropriately and loud areas with no beds, lack of cleaning and disinfecting, where there was no infirmary and inmates were not in control of their health and well-being because they have a loss of personal control well-being and safety because they couldn't leave on their own free will.

The CCJ staff failure to properly observe and/or contact a doctor in Ludwick's case just as in Hayley Essenberg, Christopher Fisher, Joseph Hehrer, Nathan Smith, Dameon Gore, and many other inmates both named and alleged in this lawsuit will show a pattern and/or a common plan or scheme showing CCJ staff's actions were extremely deliberately indifferent to inmate needs and it is customary at the CCJ with influence from levels as high as the Clinton County Commissioners' office were the Commissioners direct the Sheriff's actions.

CCJ's lack of learning from its own mistakes even in the face of damaging reports against its procedures maintained its course and it inevitably led to significant illness, loss, and death that puts the CCJ staff's deliberate indifference. William Adams authored report that found the safety checks done by CCJ staff during Hehrer's time there were done in a manner that was lazy and indifferent and overall lack of care to inmates' basic medical needs. told dr. parker he was ok in an effort to avoid the torturous holding cells used illegally and irresponsibly for medical observation because of the utter lack of supplies and/or allocated resources.

Nurse Dawn Thelen, who was on staff at CCJ for ACH in March 2019 for Hehrer's case testified that during her time at the CCJ, "people are always sick a lot in jail and that she really can't care for inmates because there's no infirmary." An infirmary is typically used to record vitals. In Ludwick's case her vitals weren't taken and there's nothing documented to show that there were any type of labs or

procedures of any kind done or ordered.

William Adams authored a report, dated September 6, 2023, regarding Joseph Hehrer's treatment when he died on March 14, 2019. ("Adam's Report"), as an expert who analyzed all of the weeks of videos from March 2019 at the CCJ, that were produced during the investigation of Hehrer's death. Followed Depositions Hehrer.

The Adam's Report concluded was that there was a generally and possibly institutional disregard by CCJ staff for the health and welfare of inmates in their custody. The report concluded that CCJ had a significant issue because when the safety checks were made by CCJ staff, they didn't stop or make any contact with the inmates or even look inside the cells. It was very cursory and merely a check the box in an abstract setting requiring collaborative communication that was wholly lacking here. The final determination that the CCJ staff's deliberate indifference to the needs of inmates, specifically Hehrer contributed to Mr. Hehrer's death.

The report determined that the CCJ staff operated under a custom of deliberate indifference, malice and animosity towards the inmates who required or requested help.

Adam's Report found other inmates were advocating for another inmates'

medical distress and they were forced to remain in their own medical distress because of the prevailing culture and pattern. It found the inmates were not important or worthy of interpersonal attention or connection with the jail staff in their checks and CCJ staff failed to interact and do not show any curiosity or concern among the ranks for the inmates and the inmates attempts to speak to CCJ Staff. Adam's Report notated that inmates were met with disinterest, dismissal and unwillingness to talk by CCJ staff.

The Adam's Report found the totality of the videos from CCJ applicable to Hehrer showed a general attitude of indifference to inmates' needs by CCJ staff even though CCJ staff and ACH medical personnel are required to provide reasonable timely care, but in Hehrer's case the CCJ custom was a deliberate dereliction of that duty to observe and amounted to deliberate indifference.

Adam's Report found that nurses did not consistently and regularly evaluate Hehrer's conditions, take his vitals or even speak with him for hours, even though it was obvious from videos he needed medical attention. It also concluded that there was no nurse, doctor, or medical professional present for over 16 hours of time each day.

Adam's Report concluded problems with the structure and logistical placement of the control center at the CCJ because the control center had an obstructed view of the holding cells. It found the conditions in the holding cells were that were

tantamount to abuse because of the cold floor and shouldn't have been used for medical monitoring because the cameras were insufficient to appropriately observe because the cameras were motion activated so there are time lapses in the video where the holding cells are not being monitored by anyone on a monitor at the control center. Hehrer told medical staff that he was alright so he could avoid being returned to the holding cells for medical observation.

Adam's Report also concluded that Hehrer's health was not effectively monitored and treatment was delayed to the point that led to his ultimate demise. (Had the medical staff did a simple blood glucose test it would have revealed him as diabetic and insulin could've saved his life as untreated Diabetic Ketoacidosis can become fatal within 24-72 hours, showing the propensity for an infirmary or place for medical observation with appropriate supplies and at least a bed should be available so CCJ staff aren't so prone making these life altering mistakes.

ACH's and its personnel lack accountability to the CCJ, there is no real mechanism to measure their efficacy. Nurse Dawn Thelen testified that there was a problem with the nurse-to-patient ratios and personalities. She also indicated that there are people that don't need help, they're hurting because they want to go out to the ER and they're playing possum, emphasizing her philosophy and/or bias against providing appropriate medical care. In an atmosphere where everything is on paper and there's no electronic management system for inmates and no policies and

procedures directly on point for how to deal with Xanax withdrawal it leads to a propensity towards deliberate and difference. It's my understanding that ACH was recently removed as the medical carrier because of the number of these incidents.

Control center doesn't actively watch the videos yet the control center is who notifies medical if there's a health issue and/or assist sit call request from the Inmate. Deputy Testimony there is nothing written down when they shift changed, other than the badge number when they were at control center for the hourly checks that they would do. The log is handwritten. They didn't deal with sending patients to the hospital at night.

CCJ staff operate with a white board where they keep any information regarding patient care and safety that gets changed out from shift to shift and doesn't create any permanent records so all of the primary information that may be useful to inmate care is not documented except for an alleged scribble on a dry erase board. (the "Grease Board")

Inmates who are going through withdrawal due to detoxing are also indicated on the Grease Board. In Ludwick's case the issue of withdrawal was not identified due to the lack of an appropriate policy and CCJ staff's lack of observation, monitoring, and/or medical treatment.

Nurses only work shifts from 8 AM to 3:30-4:00 PM based upon prior

deposition testimony and there is very minimal oversight of ACH's function both in the capacity of nursing and as applies to Dr. Parker. Dr. Parker only comes one night a week, which is sporadic and is completely and totally unaccounted for in any documents. Vitals and labs are overlooked. Medical staff are supposed to be available 24/7, 7 days a week. They are not and deputies are extremely unlikely to engage their services at times when medical staff is not present and communication between CCJ staff and ACH personnel creates the significant possibility of deliberate indifference to inmate's needs.

Multiple sergeants including Sergeant Richard Stout, Sergeant Chad Bayshore, and Sergeant James Burdick have been there for a long time, while the culture and customs identified in the Adam's Report pervades. CCJ staff is run by the old ranks, while there's a large turnover at the younger guys because of the negative atmosphere notable from depositions of Nurse Thelen and prior CCJ staff.

**MICHEALA LUDWICK**
**June 10, 2023**

CCJ provided a Medication Administrative Record, a Protocol Sheet that included Hehrer's vitals, and a Medical Progress Note from Nurse Wendy Freed for Hehrer. There will be no such record for Ludwick.

In Essenberg's case that occurred after Ludwick's CCJ staff also lacks

documentation of her 5 day stay that resulting in a 5-10 second flat line at the hospital due to the state her health, which was only caught by a judge at a bond violation hearing when he ordered Essenberg to be released for medical treatment. Essenberg's medical condition when she appeared in court is dire and shameful. The Judge could easily determine the medical need that went unnoticed by the customs at the CCJ.

Ludwick believes that the number of 911 incident reports since 2017 where inmates have been transferred to hospital are minimal because of the CCJ staff de-facto policy of discouraging against inmates being sent to the hospital like the inmates are trying to get over on them when they voice legitimate medical concerns. The CCJ staff's process uses regarding calling doctors is confusing as different CCJ staff have different interpretations of the availability of a on-call doctor other than

After Hehrer's March 9, 2019, transport to the hospital, Dr. Parker made a list naming himself number one, Wendy Freed number two and Nurse Dawn Thelen number three as far as emergency medical contacts which shows that ACH is operating contradictory to the CCJ Inmate Medical Care Policy that is widely regarded as custom by CCJ staff. Wendy Freed and Dawn Thelen weren't available 16 hours a day so it would be illogical for them to be on emergency medical personnel contact list because they wouldn't be available to consult outside daytime business nurse's hours.

Ludwick begged Sergeant Stout and Alexis Chapko numerous times both prior to having a seizure from the Xanex withdrawal symptoms she sought assistance with. Ludwick informed Chapko and Stout that she needed her medicine, that she was not eating, she was vomiting incessantly and her mental health was declining and potentially becoming episodic. In Ludwick's case there are inmate witnesses available to describe her condition to corroborate CCJ staff should have acted.

After Ludwick was booked into the (lacking booking policy) CCJ she spent two horrifying days in the medical receiving cells where she exhibited signs of sickness, including vomiting. In a setting where she should've had her health and safety checked constantly and vigorously it was deliberately disregarded, and CCJ staff only checked on Ludwick by looking through the windows of the receiving cells and never provided any realistic attention or contact inside the holding cell. The camera's in the receiving cell must not have been motion activated because her signs and symptoms were severe and apparent. CCJ Staff and ACH complete lack of documentation regarding medial and or remedial care of Ludwick.

CCJ staff did not fill out any types of requests for medical assistance from the nurse for Ludwick, even though she was adamant that she needed help. CCJ staff did not contact Dr. Parker and/or any appropriate medical professional to have them consult, examine, and/or provide medical intervention as required by any CCJ Inmate Health Policy in place during any relevant times.

Nurse Thelen also testified that she couldn't pay attention as much while working because she had so much on her plate. She also said that the inmates were responsibility of the jail again deflecting any blame from the minimal staff provided by ACH.

Ludwick saw the nurse on her third day at the CCJ even though she exhibited signs that she required emergency medical assistance Ludwick was dismissed by a condescending and absent Nurse Dawn Swanson being told she had to wait to see Dr. Parker to address any issues with her medications and it could be a while before she would be able to see him. This was custom at the CCJ. Do not send out inmates to the hospital. This is how Ludwick's extremely obvious deteriorating medical state and medical needs that were evident based on time Ludwick was without food and consistently showing signs of distress by throwing up, which will be front and center in the video's recorded at CCJ.

Nurse Swanson appears to fall in line with her predecessors relying on the CCJ custom derived from the principles of Dr. Parker to not send inmates to the hospital in fear of them "faking it" and/or stated another way by Nurse Thelen, was "playing possum". Ludwick's deteriorating medical condition, due partially to her admitted lack of eating, was completely overlooked and intentionally disregarded by CCJ staff, ACH medical personnel, including that Dr. Parker should have been consulted or at a minimum something medical notated to assist changeover staff.

Nurse Swanson's instructions to Ludwick that she would have to wait to see Dr. Parker during his clinic hours doesn't amount to medical treatment, especially since Nurse Swanson disregarded doing any type of examination or evaluation of the state of her health and need for emergent care that sets this case apart from the reasoning in Hehrer, that determined a medical malpractice standard was appropriate where Hehrer met with numerous medical personnel and was written prescriptions after at least having the ability to consult with Dr. Parker even if Dr. Parker's efforts were grossly negligent and woefully below any applicable standard of care in the industry in that case.

Ludwick's case should not be decided on the grounds of medical malpractice because she wasn't afforded any medical care and/or treatment that caused CCJ staff and ACH's efforts to be maliciously deliberately indifference in the same manner that caused the deaths of Christopher Fisher, Nathan Smith, and Dameon Gore, and the extensive injuries of Ludwick and Essenberg. CCJ should've known about the dangers its de facto customs led to deliberate indifference to inmate's basic needs.

Ludwick was transferred after day two into the M Dorm where she continued to exhibit obvious signs of illness that necessitated immediate medical emergency assistance. One of the reasons CCJ staff were unable to monitor Plaintiff while she was in M Dorm is because the monitors don't show parts of the dorm.

Ludwick contacted her boyfriend to bring her a Zofran because she wasn't

provided with any other treatment. Nurse Dawn Swanson was enlisted to assist her in taking the Zofran that was not prescribed by a doctor and neither Dr. Parker, nor any other medical professional was consulted. Ludwick had a three minute long, violent Grand Mal seizure contemporaneously with taking the Zofran. This will be evident and irrefutable by the videos at the time that it occurred.

Nurse Dawn Swanson viewed the enormity of the seizure and told EMS the seizure she thought was a panic attack to avoid accountability for failing to provide basic care of inmates and their human needs. A licensed medical professional should be capable of identifying a three-minute grand mal seizure as a panic attack. Nurse Swanson knew the interactions that she'd had with Ludwick where she had been dismissive and condescending, but she further undermined Ludwick's medical care by giving wrong information that is notated in the reports from EMS and in the ultimate medical records that have been provided when EMS was tasked with Ludwick's care causing her emergency care to be further compromised by CCJ staff and Nurse Dawn Swanson.

Ludwick also repeatedly called her father, who in turn voiced his concerns to the CCJ staff, who disregarded their pleas for medical assistance did absolutely nothing, as attested to by the lack of any documentation showing even a minimal attempt to provide any medical attention except for instructing inmates they need to wait until Dr. Parker's clinic hours to consult with him even though the ACH

contract called for 24/7 doctor availability, whenever that was, because it was highly variable and there was no oversight or mechanism to track when and/or if Dr. Parker spent the minimum requisite time at the CCJ. CCJ Staff and ACH medical personnel wholly lacking in documentation regarding inmate treatment or care.

Christopher Staggs, Hehrer's cellmate described CCJ staff as "cruel and malicious". He said CCJ staff don't really do a security check when they're doing their rounds with handwritten logs. Ludwick suffered the same fate as Hehrer because CCJ staff failed to appropriately observe and or have appropriate customs for documentation leading to their behavior continuing involving incidents of death and/or injuries.

Alexis Chapko and Sergeant Richard Stout specifically and to the best of Ludwick's recollection other CCJ staff that also requested assistance from will be the subject of discovery. Dawn Thelen talked about recording requirements and testified regarding writing down signs and symptoms if somebody is complaining of being sick. CCJ staff and/or ACH personnel cannot produce any type of documentation supporting a record of her health needs, aside from a kite that was used that went unanswered.

There was no care whatsoever that was provided, even though it was or at least should have been known that her much-needed Xanax prescription that she had been using for 15 years was being withheld forcing withdrawal symptoms that

should have alerted CCJ staff to provide enhanced observation and monitor more closely more often.

Ludwick has already had 2 extremely severe seizures after the June 10, 2023, grand mal seizure, one of which required emergency medical intervention at her place of employment on ______ and one that occurred in February 2025 that occurred in Ludwick's home where she was unable to get any medical assistance and had to endure the severity of the seizure without any medical assistance.

In Hehrer, there was intervention by medical staff, regardless of how bad it was and that case was decided based upon medical malpractice but in Ludwick's case she was never examined and merely shucked off by Nurse Swanson and told to stand in line and wait until whenever Dr. Parker decided to do clinic that wasn't a set date or time. Nurse Swanson mainly told inmates that they had to just wait until Dr. Parker's clinic hours, to circumvent and/an all requirements for her to provide care to the inmates in the care and custody of CCJ staff.

## ISSUES WITH BOOKING CELLS AND BOOKING PROCESS

Ludwick doesn't remember any questions being asked at booking. Essenberg didn't remember any questions at booking. In Fisher, CCJ woefully failed to do a sufficient inventory search that would have alerted them to monitor Fisher more closely and more often pursuant to CCJ Booking Policy. In the case of Dameon Gore, a young entrepreneur who owned a breakfast shop in St. John's, was widely

liked, and who was arrested and determined to have a .275 blood alcohol content.

Although the policies at the CCJ require that an inmate be sent to the hospital for observation with a .3 or above BAC. Gore wasn't booked appropriately and his intoxication was overlooked, putting the CCJ staff's deliberate indifference to his needs on display.

CCJ Booking Policy states inmates are only given a mat and a blanket if CCJ staff subjectively decide that the inmate's behavior warrants it. Adam's Report noted that in the booking area there was no nursing medical station to be able to do any types of cell checks of the medical observation area making it even more dangerous to inmate health and safety.

These holding cells are used for any medical purpose in an antiquated and dangerous practice has been the cause of significant loss of life and well-being from the systematic failure of the CCJ staff that amounts to deliberate indifference towards the needs of inmates and total reliance on an understaffed ACH personnel, whose incentive to provide quality services is undermined by the financial challenges providing actual medical care would require because ACH has a razor thin contract and budget not designed for inmates to be receiving appropriate care. CCJ staff tried to blame ACH, but in doing so showed their lack of involvement and disregard for inmates' healthcare without actually acknowledging their basic responsibilities as deputies in the correctional field.

A noticeable problem occurs at the CCJ systematically at the booking stage when they're doing the initial medical screening. Instead of going through the medical screening form with inmates specifically in Ludwick's case the CCJ staff merely use a form boiler plate piece of paper that already has the answers circled so they don't have to ask a lot of the questions. That is why CCJ staff took less than 3 minutes to do the medical screening of Christopher Fisher, which caused them to miss details that could have saved his life. The way the Booking Policy is applied by CCJ staff is deliberately indifferent to the medical needs of the inmates who are in custody and vulnerable.

They should have found drug paraphernalia on him, so they would have at least observed him more closely and monitored him more often. Fisher either consumed or had consumed opioids and methamphetamine that although it caused some type of seizure that was entirely missed by CCJ staff.

Inmates are not adequately screened at the initial booking in all policies are not utilized and instead a hap hazard manner of processing inmates in that in some cases negates the entire purpose of the screening, as was the case with plaintiff when there were not any remedial efforts put in place even though her prescription medication was taken away from her cold turkey and the incidence of the eventual seizure skyrocketed when it could've easily been identified and addressed instead it went wholly overlooked undocumented.

CCJ staff deliberately disregarded Ludwick's medical needs when an ordinary person should have been aware of her imminent need for medical intervention with a qualified medical practitioner in a setting that is equipped with the basic supplies necessary to do a perfunctory exam, that is not currently available as was the case. In Hehrer a number of inmates were interviewed that had contact with Hehrer and specifically requested CCJ staff to assist in Hehrer's medical treatment because he appeared to need it very badly.

## HANDWRITTEN LOGS AND INMATE SUPERVISION

The handwritten "rounds" logs (the "logs") is the only entry that CCJ staff use with a badge number to signify that the check didn't observe anything unusual or a simple OK, without the inclusion of any other details and or notation regarding any observations. The logs do not provide ANY information including information regarding any unusual activities and/or requests and/or observations inmates are instead just told to send a kite instead of the CCJ staff providing even basic monitoring of inmates needs while in their custody, especially inmates who are dealing with significant, and/or novel medical issues like Ludwick here being left on an island dealing with Xanax withdrawal without basic medical attention while pleading for help repeatedly as will be shown by CCJ videos captured during her incarceration.

Glaring in the days and hours leading up to Ludwick's horrific seizure that severely negatively impacted on her mental and emotional well-being that has mentally and emotionally crippled Ludwick's ability to maintain the same quality of life before the lifelong injuries she faces as a result of the Defendants.. Unfortunately, in a manner consistent with the other cited here who were either severely injured or lost their lives at the hands of the CCJ and/or ACH medical personnel complete lack of attention and/or regard for inmates' basic needs and or medical emergencies.

CCJ staff can't see the inmates a lot of the time when they are in M Dorm because of blind spots and lack of spatial coverage. CCJ staff tell inmates to go to camera and waive a hand if they need something because CCJ staff can't see them. Nurse Dawn Thelen, who was working at CCJ in 2019 when Hehrer died testified that sometimes they need to put better eyes on the back of the pod because of the lack of visibility on the cameras and acknowledged it in the atmosphere it really chaotic and really noisy. Lack of visuals on the dorms raise further red flags regarding CCJ's systematic issues that contribute to inmate care and safety.

**HAYLEY ESSENBERG MARCH ___ 2024**

The policies and procedures in place de facto at the CCJ incentivized avoiding sending inmates to the hospital, even in some of the most dire of situations including the situations of Plaintiff in this case, Hayley Essenberg, who spent five days

deteriorating in front of the eyes of both ACH staff and the CCJ staff in March 2024 after the issues were documented regarding plaintiff in this case and the report from Mr. Adams was widely available through the significant litigation surrounding the CCJ staff's alleged indifference to inmate needs.

**~~DAMEON GORE~~**
**December 17, 2025**

Even more egregious with Dameon Gore. .287 BAC resisting and belligerent. He was disregarded and thrown in a torturous receiving cell. It should be noted that one of the other inmates in the holding cell told MSP that he believed that Gore had a seizure at 12:00 midnight prior to being found around 4:00 am basically dead. Attestation to the lack of observation and monitoring that includes video feeds that are motion activated so if people are all sleeping in the holding cells the inmates aren't on the monitors and can't be seen from the control center. I will send you an email confirming that everything has been sufficiently updated. Please confirm that you have access to folders.

Gore's death didn't receive adequate attention because MSP did a menial and not even cursory investigation that was geared toward a finding of compliance with policy in the case of Dameon Gore, a young entrepreneur who owned a breakfast shop in St. John's and who was arrested and determined to have a .275 blood alcohol content. CCJ Inmate Health Policy requires that an inmate be sent to the hospital for observation with a .3 or above BAC. Gore didn't receive appropriate observation in

booking that significantly contributed to the CCJ staff's deliberate indifference to his needs.

Mr. Gore was placed in a medical observation receiving cell, and as previously indicated the observation that someone gets in a receiving cell is limited to someone looking through the door every hour and not interacting with an inmate in a state such as Gore's who should've been designated as high risk and high needs with more contact and more significant contact.

**~~NATHAN SMITH~~**
**June 14, 2024**

There was a similar issue with Nathan Smith in 2024, that went largely unreported and while Plaintiff reserves the right to add allegations regarding Mr. Smith's untimely and coincidental demise it appears that the CCJ staff's policies regarding safety checks failed Mr. Smith as well, even if only because it missed the onset of a medical emergency that could have been identified with more intimate safety contacts instead of just glancing through a door, peering into the sole of inmates being tortured by being forced to try and get bet in a chaotic, dirty, concrete floor without being even remotely supervised.

The investigation by the MSP into the death of Dameon Gore was muddled and redacted, and declared to be by natural causes even though natural causes includes incidents where people don't receive necessary care that leads to a medical event that is otherwise classified as natural causes. The MSP relied too heavily on

the finding of natural causes and the redaction of the Autopsy as to the cardiovascular information, which is found to be peculiar and misleading based upon the information released in the initial press releases that were made on Mr. Gore's case in relation to the cause of death and/or culpability of CCJ staff.

The medical screening in Nathan Smith's case was lacking is although his alcohol levels weren't very high given the significant amount of cocaine that registered in the system it should've been easily recognizable that he was under the influence of a substance by interacting with him further and more in depth than what the booking procedures at the CCJ entail, which will be shown by the videos in the cases of Ms. Ludwick and Ms. Essenberg.

Nathan Smith was seen emotional and crying in the cell and wasn't given any kind of care and was left to die without observation by the CCJ staff and/or a complete disregard for their duties to ensure basic medical needs are attempted to.

Nathan Smith's reports regarding the underlying charges were written after his death in a manner to substantiate that there weren't any signs of his intoxication although the body warned cameras of the myalgia Police Department in the Meridian Township Police Department are likely to conflict given the level of cocaine alleged to be found in Nathan Smith, sister. Died of a condition consistent with heart failure.

**CHRISTOPHER CORBIN NOVEMBER 19, 2006**

Christopher Corbin alleges abusive and intimidating behavior and asks for a

review of CCJ's policies. He complained he was assaulted by another inmate after 2 weeks of intimidating and abusive behavior precipitated by inconsistent and/or absent dormitory rules by CCJ Staff resulting in an atmosphere of rule by intimidation. As a result of the assault his nose was broken and he was not given any medical attention.

**2010 ERROL MARTEL TRAVIS**

2010 Errol Martel, Travis, who indicates that he received severe cuts running from the police and although he made repeated request for medical help nothing was done and he indicates that all they said is to let the nurse know, but the months went by without any treatment, regardless of the number of complaints that he made very consistent with Ms. Ludwick and Ms. Essenberg, and with the remaining cases that led to injury death associated with CCJ's lack of care.

If someone is very sick and needs medical help right now with the nurse not available until morning how is that addressed by night staff. "I would have them define what very sick is."

**CHRISTOPHER FISHER**
**December 14, 2022**

In the Christopher Fisher case Brian Howe says that he noticed that Fisher was faced down at 5:30 in the morning during breakfast when it was served. However, How stated that although his logs reflected that he did count at 6:00 AM 7:00 AM and 8:00 AM he acknowledged that he didn't physically check them and he says that

he was busy walking around and he randomly checked in although no one seemed to see Christopher Fisher Christopher Fisher was booked He was taken out of the cell holding at 3:09 and 34 and returned at 3:1215 it is reflected in the report that at 10:07 on December 13 one of the CEOs looks in the window for one second of receiving cell five it's also acknowledged by CEOs that the count requires remarks although the only remark that is used by CEOs is an OK mark to determine that there isn't anything unusual instead of having a portion to provide any types of remarks regarding inmates medical physical or mental issues.

Deputy Devon Hummel, said regarding Fisher at a deposition that all he did is look through the window and did a "skin count". A "skin count" is not defined in the correctional industry, because the standard in the correctional industry is to check whether the inmates are breathing, instead of just looking through a window interacting with the inmates is essential to inmate observation and supervision while in custody. Fisher's cell mates all said that it was obvious that he had a significant problem and that it was overlooked by CCJ staff although it should have been apparent

Fisher's cell mate Joseph Kirk said that he noticed Fisher sitting up with this head backwards and eyes rolled back in his head with his mouth open. He said he noticed Fisher was sleeping in a very abnormal position for a significant amount of time. Kirk recalls Nurse Dawn Swanson stating that there was Riga mortise when

they turned the body over as it was black and blue he said that he saw him knocking off he noticed Christopher breathing funny that he obviously appeared under the influence and he suspected him to be a method because of the sores on his face, all of which were missed entirely by CEOs during the booking process and during the supervision phase of Mr. Fisher's incarceration at the CCJ

**Timothy Langelier Report**
**February 7, 2025**

In Timothy Langelier's report dated February 7, 2025, ("Langelier Report") it was noted Fisher seemed to be lethargic, nodding, stumbling using the wall to embrace himself, and it shows that the videos activate solely on movement, but that there's otherwise physical signs of a medical emergency and if there's a known medical issue, it should be closely observed, which is a fault in the booking process that led to fatalities when they could've been prevented.

In Fisher there was an issue with the pat down search where it should've been much more thorough in order to determine whether or not he had narcotics on him because there were indications from the initial search that they needed to do a more thorough search. Further, the medical screening was a horrent in Fisher's case and obviously missed the significant amount of distress.

Langlier's Report found that CCJ staff should've distributed the meals by providing them to the individual inmates so they could interact with them. It urged the use of name to face verification cards. Langlier's Report concluded that for CCJ

staff to make sure to track the inmates appropriately a computer management system was necessary, yet a computer management system wasn't utilized by the CCJ until after 2025.

Langlier's Report concluded that Fisher should've been fully stripped, searched and housed separately because of the indications that he had a potential drug problem. CCTV should have a continuous view in no time lapses so that signs of medical distress can be viewed, including staggering, which would have been shown in Fisher's case. It found CCJ's Inmate Medical Policy that the nurse has 14 days after booking to do a medical and mental health appraisal on the inmates.

If CCJ staff actually take a note of an inmates behavior the policy is to leave a written note in a handwoven basket for nursing to deal with. Nursing is only available during the day and aren't staffed 16 hours out the day, undermining CCJ's prior attempts to place all blame for their outdated and ineffective operations that lacks credibility in continuity and care.

Langlier's Report concluded that CCJ staffs' testimony regarding the concept of a visual "skin check" that was done instead of watching the chest rising or falling. There is no "skin test" that is a standard in the correctional industry because it is wholly unreliable because a person asleep with a color blanket cannot be adequately observed without interaction or closer inspection as was not done in any of these cases which shows a consistency of the CCJ to either not follow existing procedures

or to follow procedures that place the life's in health of the inmates at risk every day. If CCJ staff had offered a tray to Fisher who laid motionless, they could have arrived at him three hours sooner before rigor mortis set in.

In Fisher Brian Howe says that he noticed that Fisher was faced down at 5:30 in the morning during breakfast when it was served. However, Howe stated that although his logs reflected that he did count at 6:00 AM 7:00 AM and 8:00 AM he acknowledged that he didn't physically check them and he says that he was busy walking around and he randomly checked them, although he didn't see anything requiring extra (minimal) attention.

Fisher was booked at 8888 and placed in a holding cell. He was taken out of the cell holding at 3:09:34 and returned at 3:12:15

Langlier's report it is reflected in the report that at 10:07 on December 13 one of the CCJ staff looks in the window for one second of receiving cell five it's also acknowledged by CCJ staff that the count requires remarks although the only remark that is used by CCJ staff is an OK mark to determine that there isn't anything unusual instead of having a portion to provide any types of remarks regarding inmates medical physical or mental issues.

In Fisher, Deputy Devon Hummel, a CCJ staff said at a deposition said that all he did is look through the window and did a "skin count". However, Fisher's cell mates all said that it was obvious that he had a significant medical problem and that

it was overlooked by the CCJ staff and should've been apparent. One of Fisher's cellmates Joseph Kirk said that he noticed Fisher sitting up with this head backwards and eyes rolled back in his head with his mouth open. Kirk said that he saw Fisher nodding off and/or "on the nod" he noticed Fisher breathing funny that he obviously appeared under the influence and he suspected him to be a methamphetamine user because of the sores on his face, all of which were missed entirely by CCJ staff due to their ineffective and antiquated procedures during the booking process and supervision Fisher's at the CCJ.

Kirk said he noticed Fisher was sleeping in a very abnormal position for a significant amount of time until he recalls Nurse Dawn Swanson stating that there was rigor mortis when they turned the body over as it was black and blue.

Langlier's report found ACH lacks appropriate policy directors and protocols to instruct CCJ staff on how to deal with inmate health and the officers repeatedly state that they're not trained medical advanced observation in here.

On December 14, 2022, the day of Fisher's death breakfast was served to Fisher in the holding cell at 5:30 in the morning, but it was just dropped next to a lot of other trays and there was no interaction between CCJ staff and Fisher during breakfast until about 9:30 am when Sergeant Stout finally found Fisher black and blue. Another of Fisher's cellmates Paul, said it was strange that he saw him in the same position that he said he hoped to use all right now that he hasn't moved.

Nicholas Cross, another of Fisher's cellmates, stated that he saw Fisher woozy on December 13, 2022, at about 9:30 PM said that he was swinging back-and-forth scratching his chest and Cross also said that no one touched Fisher when CCJ staff delivered the food trays.

## ~~JOSEPH HEHRER~~
## DATE OF DEATH MARCH 14, 2019, AGE 29

During her deposition, Dawn Thelen was questioned in regard to video of her, shaking her head somewhat disbelief shortly after Hehrer had been removed to the hospital and one question, she said that "she wish she could've done more, but this is their jail."

On March 9, 2019, Sergeant Stout calls 911 and says that hair is throwing up a lot of blood this is significant because him throwing up blood was disregarded by staff at the CCJ, the corroborates, the policies and procedures of the CCJ that undermines any semblance of basic medical care or basic care to inmates

Prior to this on March 7, 2019, Deputy Cyle Perrien wrote a Protocol Sheet regarding witnessing Hehrer vomiting where Hehrer said he didn't want to go to receiving because of the nature of sitting in a holding cell. Hehrer was sent to the holding cells by Sergeant Stout against his wishes for "medical observation".

March 14, 2019, Memorandum sent by the acting Clinton County Sheriff Lawrence Jerue in response to the death of Hehrer that outlines the obvious disregard

for Hehrer's condition. It indicates in substantive part that on January 23, 2019, Hehrer was booked into CCJ. On February 5, 2019, after being at CCJ for 13 days he had his first encounter with medical and a limited medical health appraisal was performed by the nurse.

On February 20, 2019, Hehrer sent the first of 2 sick call requests indicating that his gums were inflamed. On February 24, 2019, Hehrer was seen by the nurse and indicated that he had been healed and that he no longer needed any medical assistance. It is believed this was done to avoid the torturous nature of the holding cells that he would be relegated to for medical observation. On March 5, 2019, Hehrer sends the 2nd sick call request stating he has a "fever, queasiness, headaches in and out, heartburn constantly throughout the day and have puked a couple of times." This request was sent on the evening of March 5, 2019. Heher was seen on March 6, 2019, and he indicated that he had been night vomiting since Saturday March 2, 2019, and "I'm not that sick, I just wanted to sleep a lot. Hehrer also indicated that he has had heartburn the last several days".

Hehrer was kept against his wishes in the holding cells for medical observation until he met with Dr. Pakrer at 6:00 pm on March 6, 2019. Dr. Parker noted that Hehrer stated that "he was ill, but he feels better now and was able to hold down his meals. Dr. Parker cleared Hehrer to return to the dorms with a note to continue to monitor his weight, although it had decreased substantially.

On March 7, 2019, at 6:20 pm, Hehrer approached Deputy Roy and advised he had been throwing up, but that he didn't want to go to the holding cells. Further, on March 7, 2019, at 8:30 pm Hehrer talked to Deputy Perrien and VanDuesen and complained of kidney pain with pain during urination. He also complained regarding a stabbing pain in his back and could not keep down either food or water. Sgt. Richard Stout was informed and ordered Hehrer back to the holding cells for medical observation, where Deputy Perrien checked Hehrer's pulse, blood pressure, and temperature and notated it in an incident report before ultimately calling ACH Dr. Mashni, who ordered 8mg of Zofran and had Hehrer drink plenty of water.

Dr. Mashni did not physically exam Hehrer and was only consulted by telephone. Further, with all cases of death or serious injury at the CCJ Hehrer's orders from Dr. Mashni are the only time Dr. Mashni appears to have been consulted in any other case of relevance. The appearance of 24/7 medical care is illusory and not only are doctors seldom summoned outside of the one day a week clinic hours and CCJ doesn't have properly qualified personnel available at all times when Dr. Parker is unavailable.

On March 8, 2019, Hehrer is seen by medical staff at 9:00 am where he indicates that he has been throwing up blood, but the nurses note said there was no blood on the floor in an obvious attempt to avoid being required to provide any attendant care to Hehrer that frankly would have likely saved his life.

Dr. Parker was notified at 9:45am on March 8, 2019, and Hehrer was prescribed additional medications, and he was required to remain in the holding cell on the premise of medical observation, although Dr. Parker never physically consulted with or examined Hehrer.

On March 8, 2019, at 2:00 pm Hehrer refused both breakfast and lunch and indicated he didn't like the food and that "I'm ok can I go to the back". However, Hehrer was required to remain in the holding cell against his wishes.

On March 9, 2019, Nurse Thelen examines Hehrer and tries to take his weight but his medical condition is finally bad enough for CCJ staff to call an ambulance to take him to the hospital where he should've been days before and ultimately dies.

**Christopher Staggs**

Christopher Lance Staggs bunkmate M dorm with Hehrer. Identifies Steve toth. 989-307-6020. He described Hehrers symptoms as "loss of appetite, sleeping a lot, no energy, pale, and vomiting red stuff which Joey said was blood. A couple of days after being sick, Hehrer submitted a medical kite. He said the nurse comes around once per day and Hehrer would approach her each time. He said the nurse advised him "to get plenty of rest and to drink plenty of fluids". He says that the nurse only spoke with Hehrer at the cell door and never took him to her office.

Staggs said that the nurse did not respond to the medical kite sent by Hehrer. He said Hehrer "repeatedly requested to be checked out, not only by the nurse but

also by the deputies. To no avail. He stated Hehrer asked for a blood test. (this would have saved his life.) Holding cells have no TV and they are cold and you're alone. In addition, the blankets and mats are inferior. He stated that Hehrer was "laying in his vomit". He said Hehrer asked the guard if he could clean the vomit from the area, the guard stated "just let him lay in it". (Officer Becker). Consistent with Essenberg

Staggs did not see any staff member check on Hehrer the entire time he was in the holding cell. Even if the guards opened the door to the cell, they never asked him how he was doing. Hehrer told Staggs that "they just keep telling him to drink fluids and get plenty of rest, they were not doing anything for him." He said he "was going to ask his mom to ask the jail to get him to the hospital to be seen." Staggs said Hehrer said "he needed a blood test and needed to be checked out by a medical doctor. Staggs said there were many occasions he was a witness to medical attention being denied. He said the 2nd time Hehrer was in the holding cell he was throwing up a lot of blood. He described CCJ staff as "cruel and malicious". He said don't really do a security check When they're doing their rounds with handwritten logs.

**Becky Fike**

Becky Fike who was with February 22, 2019, she said not goo. "Sleepy very skinny, very tired, almost lethargic and that he looked pale. When she observed him in jail, he was very noticeably skinnier" she said she could tell he was sick. She stated that Hehrer looked really bad.

**Brittney Nicole Pifer**

**John Velton**

John Velton, Dorm M can house approximately 64 inmates. He said Hehrer didn't look good and said he felt "deathly sick". Hehrer told Velton, "they weren't doing anything for him and he was being charged for being looked at". Velton will testify that he heard the guards saying that Hehrer was faking an illness and was being a "crybaby". Velton said that Hehrer was pale look and did not really do much "he looked beat down."

**Justin Palus**

Justin Palus Have to fight for a mattress at 4 am from guard. He said the staff is very mean. The staff moved all the people out of Dorm M in response to Hehrers death. He stated that sometimes the CCJ staff will not provide a basic necessity such as toilet paper. He said the only question they asked at medical screening was if he was currently taking any medications. Just said he saw a nurse on the last day of his sentence, he did see a nurse who asked medical screening questions. He had to trade his food with other inmates to get ramen because he had a nut allergy.

**Dustin Benner**

Dustin Benner was a cellmate of Hehrer and provided detailed Affidavit dated November 21, 2023, indicating the he tried to get assistance for Hehrer from the doctors. "I requested to be seen by a doctor, and it wasn't until days later and

requesting many times to be seen that a nurse did a brief medical screen." He said he was more worried about the condition of Hehrer as he could clearly see he needed medical attention.

"This kid needs help, he needs to see a doctor." And the officers exact words were "Well, he was hiding puking from us for a while, so he cant be that bad if hes hiding it and he's already seen the doctor. Benner noticed Hehrer throwing up blood in the drain shortly thereafter. Benner says he "got an officers attention to let him know that Joey was throwing up blood. I said "Hes getting sick, and its blood. He needs help, and the guard didn't say anything. He said Joey turned to him and said "Oh they don't care. Ive been doing this for a couple days. They already know." He attested to the fact that the CCJ staff gave him a pill and a cup as was evidenced in report which is unreliable.

Benner says his exact words were "This kid needs help but heard the doctors say he was hiding his puke from us and that it couldn't be that bad because he's already seen a doctor and when Benner told CCJ staff that Joseph Hehrer was throwing up blood it was disregarded by Nurse Thelen, who stated that she didn't see any blood. Benner goes on to describe a shift change at 6:00 am the day Hehrer was transported to the hospital, March 9, 2019.

Benner describes Nurse Thelen checking his vitals and witnessing he was struggling to stand up to the point the he needed help to stand. Benner describes

Hehrer as stating, "Yeah, they don't care, thanks for helping me here, but your wasting your breath. He wanted to tell the story about how unfairly Joey was treated, the ignored attempts to get the officer's attention and the fact that he was extremely sick and needed serious help.

Benner testified that the CO's wouldn't take kites while you were in holding cells and it takes weeks to see medical personnel when you're in the dorms. "When in the dorms it takes days, maybe weeks to be seen by a nurse or doctor and some of the officers will rip up (medical) kites and throw them out." He stated that neither he nor Hehrer had a pillow. He also says that "you can just see the misery."

Benner also stated that while he was with Hehrer that no medical staff came by to see him regardless of his requests. He stated that during booking CCJ staff asked him if he had any significant medical issues that they needed to know about and that was the extent of the booking. Then rest of the questions pertained to his identity. He stated CCJ staff didn't ask medical questions during the booking intake process. He said he signed papers but didn't look at them. He said when doing a medical kite, the inmates will watch to see which officer is coming. They will sometime take it back off the door because they know it will not get turned in. He said "no one ever came to clean the cell while he was with Joey in."

**JAMES HINTON**
**2016**

James Hinton filed a complaint in the Eastern District of Michigan November

9, 2016, alleging deliberate indifference. Hinton stated he requested medical attention due to his recent back surgery. In response, one of the booking Deputies, responded to Plaintiff: “Are there going to be any problems with you? Hinton didn’t answer. The same Deputy then told Hinton, “this is my house, and we are not going to have any problems with people like you in my house.” Hinton requested medical attention again and was refused. Then the Deputy ordered four or five other Deputies, in the booking room, at the time, to “Take him down”. The Deputies proceeded to beat Plaintiff with their batons, and tazed Hinton repeatedly until he defecated on himself and could no longer walk.” Hinton was then transported back to the Wayne County jail.

Hinton alleged that Deputies maliciously and baselessly beat him and needlessly tazed him after repeated requested medical treatment and CCJ then failed to ever give Plaintiff the medical treatment he desperately needed and requested. Deputy Richard Stout, Deputy Van Deusen-Lott, Deputy James Burdick, and Deputy Lova, Captain Hoskins, and Deputy Jay Biggs were sued individually.

**DANIEL PFEIFER**
**2014**

Daniel Pfeifer alleged on October 28, 2014, he fell while descending from his top bunk at the CCJ and injured his chest and shoulders. Two days later, he exhibited signs of a heart attack and was taken to St. Johns. Hospital where x-rays were taken of his chest but refused to x-ray his shoulders. He was told he had muscular skeletal

tears (torn chest muscle) and was prescribed over the counter medication, Tylenol, and given paperwork showing shoulder exercises to do, which he was never able to perform.

Pfeifer said that during the period between October 31, 2014, to December 12, 2014, while in the CCJ, he submitted eight medical kites to the health care department complaining of ongoing shoulder pain and requesting x-rays be done on his shoulders to properly diagnose the injury. He asserted that the over the counter Tylenol wasn't helping and the kites were answer by an RN, in which one stated "no physical indication requiring x-ray of bone" with the continuation of the ineffective treatment plan of Tylenol, of which Pfeifer continuously ran out of and had to do without any pain relief while continuing to kite for more.

**THOMAS CENSKE**
**2004**

In 2004 Thomas Censke asked for help in our grievance in said that "he got beat up and choked by CCJ staff and thrown in a holding cell for four days with no exercise shower, no mental health services use "harass, intimidated, and torture." Maybe this was merely an aggrieved inmate, but given the history at the CCJ, it lends credibility to the contention that CCJ's behavior has been more than underwhelming.

**DOUGLAS MCPHERSON AND DOUGLAS COLEMAN**
**1997 AND 1998**

In1997 Douglas McPherson and in 1998 Douglas Coleman filed lawsuits in federal court against Clinton County and the CCJ, but the underlying facts are not

available as only the docket entries are maintained due to the amount of time that has elapsed, but Ludwick believes that these cases are likely to align with the rest that were cited.

**THOMAS TIDERINGTON**

**MARK DURFEE, DECEMBER 2023**

**BTPD, MTPD**

**CUSTOM, POLICY MOVING FORCE**

**PRETRIAL DETAINEES V. DEFENDANT'S SERVING A SENTENCE**

**DAVID CARSON**

**Line of Sight Control Center obstructed.**

**I SWEAR THAT THE INFORMATION CONTAINED ABOVE IS TRUE TO THE BEST OF MY INFORMATION, KNOWLEDGE AND BELIEF.**

Dated: August 4, 2026

________________________________
**MICHEALA MICHELLE LUDWICK**
**Plaintiff**

Subscribed and sworn to before me 4th day of August 2026.

________________________________
Notary Public: Jacob Alan Perrone

Clinton County, Michigan
My Commission Expires: 02/22/2032
Acting in the County of Ingham

Dated: August 4, 2026[-==========================================

/s/Jacob A. Perrone________________________
JACOB ALAN PERRONE, ESQUIRE (P71915)
**DRAGON LAWYERS PC ©**

## PROOF OF SERVICE

I, Jacob A. Perrone, being first duly sworn, deposes and says that on August 3, 2026, I served by email the following documents: Plaintiff's Response to Defendant's First Set of Interrogatories and Request for Production of documents, and this Proof of Service to the following individuals:

Dated: August 3, 2026

/s/Jacob A. Perrone__________________________
JACOB A. PERRONE (P71915)